Mentser, Appellant, *v.* Mentser.

Argued May 5, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADT-
FELD, PARKER, RHODES and HIRT, JJ.

*Edward J. Steiner,* with him *Harry C. Golden,* for
appellant.

*M. D. Wedner,* with him *Harry A. Heilman,* for ap-
pellee.

OPINION BY RHODES, J., July 13, 1939:

This is an appeal by libellant in a divorce action from
the dismissal of his libel by the court below. Libellant
and respondent were married on June 28, 1925, in Ohio,
and lived together at various places in the city of Pitts-
burgh and its suburbs, and in Kittanning, Pa., from
that time on until about March 1, 1936. About March,
1934, libellant opened an automobile accessory business
in Kittanning, and made his home there for several
months before respondent joined him. By the marriage
they have one child, born February 7, 1930. Libellant
left respondent on or about March 1, 1936. On July 2,
1936, libellant filed his libel in divorce, and a subpoena
was awarded. The grounds of divorce set forth in the
libel were cruel and barbarous treatment and indignities

to the person. A bill of particulars was filed by libellant. Respondent filed an answer in which she denied the material averments set forth in the libel and bill of particulars. A master was appointed, and testimony was taken. The master recommended that a decree be entered divorcing libellant and respondent from the bonds of matrimony. On appeal the court of common pleas dismissed the libel, and libellant has appealed to this court.

The issue before us is whether there has been presented a clear and satisfactory case by libellant on which the determination of the court may be confidently rested. As we have frequently stated, the burden of proof in such cases is upon libellant who must establish his case by clear and satisfactory evidence; and the weight of the evidence must be in his favor. *LaClair v. LaClair*, 128 Pa. Superior Ct. 469, 194 A. 224; *Putt v. Putt*, 118 Pa. Superior Ct. 74, 180 A. 92. Having examined the evidence in order that we might determine, on our independent judgment, whether the record sustains the grounds charged in the libel, we think that if the charges were to be sustained we would be obliged to look primarily, if not solely, to the uncorroborated testimony of libellant, which in all material matters was either categorically denied or explained by respondent. Both libellant and respondent were corroborated by various witnesses in some respects, but the serious incidents to which libellant testified either took place when they were alone, or no corroboration was produced. It is true that "a decree may be supported by the testimony of the complainant alone, but if this testimony be contradicted and shaken by the respondent and there be *no convincing circumstances warranting a disregard of the contradictory evidence*, a case has not been made out": *Twaddell v. Twaddell*, 95 Pa. Superior Ct. 429, at page 432.

We are not unmindful that the witnesses in this case were heard by a master, who recommended that a di-

vorce be granted to libellant. Although such recommendation is only advisory and not controlling, still it is to be given the fullest consideration by us, since he has the advantage of seeing the parties and hearing the testimony. *Golden v. Golden*, 134 Pa. Superior Ct. 211, 3 A. 2d 941. However, the weight of the testimony and the credibility of the witnesses are to be determined by the tribunal which is last called upon to pass upon the facts.

The parties apparently lived together in a most satisfactory manner until they moved to Kittanning in 1934. It was there, after about nine years of married life, that their domestic troubles began. Libellant testified to several acts of alleged cruelty, which we shall hereinafter briefly consider separately. In addition, libellant testified that respondent used profane language, and often called him a "mumser," which apparently has several meanings, including "a child of illegitimate birth." He also testified that respondent was selfish, nagged, and had an unreasonable temper, and on one or two occasions slapped him.

Libellant testified that on December 9, 1935, in their apartment at Kittanning, respondent slashed him on the wrist, arm, and shoulder with a safety razor blade; that again in January, 1936, while he and respondent were in a room adjacent to the lobby in the Hotel Wentworth, in New York City, respondent attacked him with a safety razor blade, and created a scene; that she struck him with a rolling pin on one occasion; that on another occasion respondent came to his store where he was working and created a disturbance which resulted in her slapping him in the face; that in February, 1936, just before he left respondent, she objected to his making a visit to his mother in Pittsburgh, and attacked him as a result thereof; that in January or February, 1936, while driving home from Pittsburgh, respondent grabbed the steering wheel of the automobile, which put the car out of libellant's control, and

it skidded across the road and turned completely around; that in May, 1936, after their separation, respondent called at his store, and after an argument between them, attempted to strike him with a steel wrench. It is upon these incidents, which are denied or explained by respondent, together with some general statements to the effect respondent nagged and abused libellant, that libellant contends his divorce should be granted. A dispute did arise between the parties on December 9, 1935, as a result of which respondent was obliged to have a physician called and an X-ray taken because of an injury to her arm at that time. Libellant was also subsequently treated for some superficial lacerations. Respondent denied that she had attempted to cut libellant with a razor blade, and explained that her injury was the result of libellant's conduct when she told him that he had not been at the store until after one o'clock in the morning as he had stated. It appears that the trip to New York in January, 1936, was at libellant's suggestion for the purpose of buying respondent a fur coat. For this he said he paid $388. They went to New York on friendly terms, and remained about a week. Libellant's story that respondent took a double edged razor blade from her pocket or bag and held it in her closed hand and started to slash him is rather improbable. Libellant produced no corroboration of this scene, although he testified that some of the hotel help saw it. We think that libellant's version of such an episode requires corroboration in order to carry conviction. Respondent denies that anything happened as described by libellant on this occasion, and testified that the only unpleasantness which developed on that trip was due to libellant's leaving her at a restaurant to go for his automobile on account of weather conditions, that she went back to their hotel alone, that they went up to their room when he returned, and that she cried because he remained away for four hours with apparent unconcern and without explanation.

That respondent attacked libellant with a rolling pin in December, 1935, injuring his arm was denied by her, and the testimony would seem to establish that they had no rolling pin in the house. Libellant stated that this attack was preceded by "the usual argument, bickering and nagging." Respondent denied she objected to a visit by him to his mother's in Pittsburgh, or attacked him as the result thereof. Libellant's testimony that respondent grabbed the steering wheel of the automobile when they were returning from Pittsburgh, in the winter of 1936, for the purpose of killing libellant, respondent, and their child does not convince us. We think if the incident occurred as described by libellant it may have been precipitated by libellant's blunt announcement in the car on the way home that he was going to leave respondent. The statement of his intention would naturally cause a shock to any wife, and especially to respondent, who had worked three or four years after their marriage, while libellant occupied various positions apparently with an income that never exceeded $30 a week. With the advent of prosperity he obviously became more independent and had new associates. Respondent admitted that she did on this occasion grab the steering wheel, but that it was purely through fright when the car started to skid on the icy road. She stated that this was a habit for which libellant had previously reprimanded her. The incidents in libellant's store, before and after their separation, were likewise denied by respondent. We give no weight to an incident where respondent came to the apartment of a friend of libellant's where he was staying one night in Kittanning. Libellant's brother, who was a witness for libellant, took respondent there.

We are not impressed with much of the testimony of libellant, or with his admitted conduct, and we agree with the court below that some of his testimony "does not have the ring of truth in it." The predominating characteristic of libellant's testimony is a labored effort

to find something in the conduct of respondent to substantiate his charges and to give some justification for his leaving her. As to his leaving respondent he testified: "Q. You decided to leave her finally when you met this Hockenberry woman? A. No, I decided that when she objected to me visiting my mother."

If we accept libellant's version of the various incidents upon which he relies, and his reason for leaving respondent, we do not think they measure up to the statutory requirements of cruel and barbarous treatment. "Cruel and barbarous treatment, within the meaning of the statute, implies a merciless and savage disposition leading to conduct amounting to actual personal violence or creating a reasonable apprehension thereof—such a course of treatment as renders further cohabitation dangerous to physical safety: *Sharp v. Sharp,* 106 Pa. Superior Ct. 33, 161 A. 453": *Davidsen v. Davidsen,* 127 Pa. Superior Ct. 138, at page 141, 191 A. 619, at page 620. Although a single act of cruelty may be so severe and with such attending circumstances of atrocity as to justify a divorce (*Krug v. Krug,* 22 Pa. Superior Ct. 572, 573), we are not convinced that there was any such single act in the instant case. The few incidents to which libellant testified did not amount to a course of treatment which rendered further cohabitation dangerous or unsafe. Libellant's own testimony does not disclose any genuine apprehension of violence to his person, or a feeling that further cohabitation was dangerous to his physical safety. See *Huston v. Huston,* 130 Pa. Superior Ct. 501, 511, 197 A. 774. It follows that libellant failed to establish actual personal violence or reasonable apprehension of it, such as to endanger his life and render cohabitation unsafe, which is necessary for a divorce on the ground of cruel and barbarous treatment endangering one's life. *Putt v. Putt,* supra, page 77.

Nor does the testimony sustain the charge that respondent offered such indignities to the person

of libellant as to render his condition intolerable and life burdensome. Where such a charge is made the law contemplates a course of conduct or continued treatment, not single acts separated by long intervals of time. Slight altercations, incompatibility, or temporary irritation are, as stated in *Knox v. Knox,* 109 Pa. Superior Ct. 45, at page 48, 165 A. 769, "too petty and trifling to justify the granting of a divorce." As the law does not define indignities, the facts and circumstances of each case must determine. The conduct and threats which may not amount to treatment endangering life are properly considered, in connection with other conduct, under the charge of indignities to the person (*Conrad v. Conrad,* 112 Pa. Superior Ct. 198, 170 A. 342); but to sustain the charge of indignities there must be evidence from which an inference of settled hate and estrangement may be deduced (*Davidsen v. Davidsen,* supra, p. 142; *Huston v. Huston,* supra, p. 513). The testimony, in our opinion, fails to show respondent's attitude toward libellant to have been one of settled hate and estrangement.

Libellant's interest in his family seemed to decrease as his financial status improved. The establishment of his business at Kittanning appeared to have proved profitable. He then began to keep late hours, coming in at three or four o'clock in the morning. His excuse was that he was buying merchandise at one or two o'clock in the morning, and was usually with a friend, whose place of business was located about 45 miles from Kittanning. We think that this statement is on a par with his explanation of his associations and acquaintanceship with a woman in Butler. Such lack of harmony as existed in their marital relations after moving to Kittanning may be largely attributed to libellant's unexplained nocturnal wanderings. Lack of harmony is not a ground for divorce under the law of this state.

Libellant has failed to establish his case by clear and

satisfactory evidence, and we agree with the court below that the libel should be dismissed.

Decree dismissing libel is affirmed.